UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 2:13-CR-56 |
| ) | |
| ANINDYA KUMAR SEN, M.D., *ET AL.* ) | |

## **REPORT AND RECOMMENDATION**

The three defendants[1] have filed a joint motion to suppress evidence. (Doc 63). This motion has been referred to the magistrate judge pursuant to the standing order of this Court and 28 U.S.C. § 636. An evidentiary hearing was held on November 14, 2013.

The evidence which these defendants seek to have suppressed are various oncological chemotherapy drugs taken from a specialized, limited-access cabinet and from a refrigerator in Dr. Sen's medical office. Special Agent Robert West of the Food and Drug Administration, and Special Agent Letitia Jones of the Federal Bureau of Investigation, retrieved a number of medications from this cabinet and refrigerator, and it is assumed that those medications are misbranded drugs which the United States intends to introduce in evidence against the defendants.

On April 5, 2012, Special Agent West and Special Agent Jones went to the medical

---

[1]For the sake of clarity, the individual defendants hereafter will be referred to as "Dr. Sen," "Ms. Posey," and "the corporation," as appropriate.

office of Dr. Anindya Sen. Dr. Sen's office is in one of the three medical office buildings owned by, and adjacent to, Laughlin Memorial Hospital in Greeneville, Tennessee. Agents West and Jones interviewed Ms. Posey who is the wife of Dr. Sen and the office manager of his medical practice. At the end of the interview, Agent West "asked" to see the various drugs then on hand in the office. "Asked" is put in quotation marks for a reason; it is clear from the video/audio recording of the interview that Agent West *demanded* to see the drugs, a matter which will be discussed in more detail hereafter.

The United States contends that Ms. Posey knowledgeably consented to Agent West's "request" that he see the drugs.

A valid consent, of course, is a long-recognized exception to the Fourth Amendment's requirement for a warrant, *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). A consent, rather obviously, must be both knowledgeably given and voluntary; otherwise, there is no consent at all.

Whether a consent is voluntary is based upon a "totality of the circumstances," and the voluntariness of a consent must be proven by the United States by a preponderance of the evidence, *Ohio v. Robinette*, 519 U.S. 33 (1996), *U.S. v. Mendenhall*, 446 U.S. 544 (1980).

The interview of Ms. Posey by Agents West and Jones (which primarily was conducted by Agent West) was captured by video and audio recording.[2] Insofar as it goes, the interview was civil enough, but it was also clear that the agents were asserting that Ms.

---

[2]An advantage which the court rarely has.

2

Posey or Dr. Sen had committed a rather egregious criminal offense. It is not an exaggeration to say that Agent West was overbearing. He may have been civil, but his tone and remarks were ominous and threatening; the agents may have been clad in business attire, and unarmed, but they nevertheless were federal law enforcement agents.

Toward the end of the interview, he told Ms. Posey that every drug she received from a particular supplier was "counterfeit," (which apparently was not the truth). He went on to say "I need you to immediately, I need you to let me look at your product." That was not a request; it was a statement, an order. He then made a remark that clearly suggested that Ms. Posey ran the risk of Dr. Sen's patients in the waiting room overhearing that there was a problem with the drugs.[3] He then said, "You need to show me your chemo room." At that point, Agent Jones made another remark concerning the patients in the waiting room.

At the end of the recording, Agent West said to Ms. Posey, "Get something to drink. I need you to show us the drugs . . . ." Although there is no audio recording from that time forward, the video recording shows Ms. Posey leaving the conference room and walking down the hallway toward the kitchen, presumably to get the drink as Agent West instructed. Agent West is seen to step out into the hall behind Ms. Posey as she was near the kitchen, well past the chemotherapy room. Ms. Posey said that he yelled at her to come back to the chemotherapy room, whereas Agent Jones testified that West spoke in a calm voice. Regardless of whether Agent West quietly or loudly instructed Ms. Posey to come back from

---

[3]West's complete sentence was inaudible, but the audible part leaves no doubt about what he said.

3

Case 2:13-cr-00056-JRG Document 90 Filed 11/18/13 Page 3 of 8 PageID #: 748

the area of the kitchen and enter the chemotherapy room, the fact remains that he was ordering her about in her own office. It is also clear that she complied with all of his commands. Ms. Posey testified that she thought she had no choice, that she had to comply with his commands.

When in the chemotherapy room, Agent West went so far as to take a medication out of a nurse's hand that was to be administered to a patient. When the nurse said she needed to give that medication to a patient, West said only, "Not today."[4]

Ms. Posey flatly testified that she never consented to any search, and that she believed that she had no choice but to comply with West's demands. She said that she was "completely paralyzed, she was so scared."

Ms. Posey's testimony is believed, without qualification. Remarkably, Agent West tends to corroborate Ms. Posey's testimony that she was extremely frightened during her interaction with these agents. West himself, early in the interview, told Ms. Posey she "looked like a deer in the headlights."

The question is whether the United States has proven by a preponderance of the evidence that Ms. Posey's consent for the agents to search the drug cabinet and refrigerator was voluntary. The United States has failed to carry that burden. Ms. Posey's "consent"

---

[4]By a belated proffer regarding Agent West's version of what transpired, counsel for the United States suggests that West asked the nurse to hand him the medication she had in her hand (as opposed to snatching it from her), and that he did so only out of concern that the particular drug was perhaps misbranded and potentially dangerous to the patient. Even if that is true, it nevertheless is another example that West was forcefully communicating by word and deed that he was "in charge" and that everyone was expected to do as he ordered.

4

was not voluntary. Thus, there was no consent at all.

At this point the issue of standing must be discussed. Who of the defendants can take advantage of the agents' non-consensual search and seizure? One's "standing" to complain of a law enforcement agent's violation of the Fourth Amendment is determined by whether that person had a "reasonable expectation of privacy" in the place searched and the thing seized, *Rakas v. Illinois*, 439 U.S. 128, 143 (1978).

Fourth Amendment rights are personal. One cannot take advantage of the violation of another person's Fourth Amendment rights; in other words, Fourth Amendment rights cannot be vicariously asserted, *United States v. Myers*, 102 F.3d 227, 231 (6th Cir. 1996). Thus, who had a reasonable expectation of privacy in the cabinet and refrigerator in Dr. Sen's medical office?

The United States correctly points out that "[a]n expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home," *Minnesota v. Carter*, 525 U.S. 83, 90 (1998).

As far as the "expectation" aspect is concerned, this could easily result in a paralysis of analysis. But upon reflection, the answer is rather simple: *All* the defendants had an expectation of privacy in the cabinet and refrigerator. The security of these drugs was absolutely necessary. Dr. Sen, as the physician/oncologist, certainly had an expectation that the drugs would remain secure from theft or adulteration. Although ownership of a place searched is not dispositive, it certainly is a factor to be considered. Here, Dr. Sen was doing business as East Tennessee Hematology, Oncology, and Internal Medicine. The lease

5

agreement for his office space was between Laughlin Memorial Hospital and Aninyda Sen, d/b/a East Tennessee Hematology, Oncology, and Internal Medicine.[5]

Therefore, Dr. Sen certainly had an expectation of privacy in the cabinet and the refrigerator simply because of his "ownership" of the office space and the two storage devices in it which were searched. But what of Ms. Posey? The court concludes that Ms. Posey had no less of an expectation of privacy because she was basically the alter ego of Dr. Sen as far as those two storage devices were concerned due to her position as Sen's office manager.

But a person's expectation of privacy is, by definition, subjective. For an expectation of privacy to justify protection under the Fourth Amendment, it must be *reasonable*. An expectation of privacy that is reasonable is one that has "a source outside the Fourth Amendment either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Rakas*, 439 U.S. at 143-144; *Bond v. United States*, 529 U.S. 334, 338 (2000). Bearing in mind that pharmaceutical drugs ultimately are administered to a trusting public, which has no means by which to determine the purity, utility, or safety of those drugs, a good argument could be made that state and federal officials should be allowed to make unannounced inspections of the drug supplies of doctors and pharmacies at any time, for any reason, on the basis of the public safety. From

---

[5]As the proof ultimately revealed, the professional corporation essentially is a stranger to any of the transactions at issue in this prosecution. Although the professional corporation exists, it was not being utilized by Dr. Sen.

6

that premise it is no great leap to conclude that society, i.e., the public, is not prepared to recognize as reasonable a doctor's or pharmacist's expectation that he or she has a right to conceal from public scrutiny *via* unannounced inspection and testing the drugs which those professionals propose to prescribe to the public for consumption. Since millions of people take prescription drugs every day in blind faith that those drugs are what the prescribers represent them to be, the foregoing is a leap that this magistrate judge finds both logical and sensible. But on the other hand, Congress has not seen fit to enact any law that would authorize unannounced, warrantless inspections of a physician's supply of pharmaceuticals. The United States Supreme Court has held that, even in the case of a "closely-regulated" business – and a physician's or pharmacist's business is such – a statute allowing warrantless searches is a constitutional prerequisite. *See, New York v. Burger*, 482 U.S. 691, 702-3 (1987).

In conclusion, Agent West *ordered* Ms. Posey to open the cabinet and refrigerator and deliver to him the drugs therein. He made no request, he asked no permission. He *ordered*. And Ms. Posey never gave permission, and she never consented. She merely complied with West's commands.

It is respectfully recommended that the defendants' motion to suppress, (Doc. 63), be granted.[6]

Respectfully submitted,

---

[6] Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1).

s/ Dennis H. Inman
                                             United States Magistrate Judge